IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

VICTOR M. JAVITCH, Receiver,

      Plaintiff,    Case No. 3:01 CV 7371

 -vs-           MEMORANDUM OPINION

JAMES A. CAPWILL, et al.,

      Defendant.

KATZ, J.

Presently before the Court is defendant Union Securities' motion for summary judgment (Doc. 279) as to the claims against it. The motion will be granted in part and denied in part as set forth below.

**I. Background**

This case arises from the fraudulent activities of James A. Capwill, the former owner and operator of two limited liability companies known as Capital Fund Leasing ("CFL") and Viatical Escrow Services ("VES"). Capwill, CFL, and VES were all involved in the viatical escrow business, and as a part of that business had custody and control over enormous sums of money entrusted to them by investors in viatical settlements. The present litigation concerns Capwill's attempts to dissipate funds entrusted to him and his companies in connection with his viatical services, so as to use them for his own purposes. Initially Frederick M. Luper was appointed Receiver on July 15, 1999. *Liberte Capital Group, LLC v. James A. Capwill*, No. 99-CV-00818 (N.D. Ohio 1999). On July 26, 2000, Victor M. Javitch replaced Luper in that capacity. Subsequently, on August 3, 2004, pursuant to a Court order, the duties of the General Receiver were modified, transferred and assumed by the Alpha Receiver, William T. Wuliger. (*Liberte*, Doc. No. 2243.)

Defendant Union Securities ("Union") is a brokerage firm based in Vancouver, British Columbia. The Receiver's claims against Union relate to Union's involvement in two transactions related to Capwill's money laundering schemes. The first involves an account opened in the name of an associate of Capwill's, Vince Norman. Capwill would supply Norman with funds to invest in stocks, but the accounts would be in Norman's name. Capwill and Norman would split the profits 50/50, with the proceeds going to fund a business venture of Norman's.

Norman's nominee account at Union was opened in late August 1998. The decision to open the Union account was made by Capwill and his friend Tony Sandelier. The account opening documents were signed during a brief meeting with Capwill and Sandelier at Sandelier's office near Orlando, Florida. Norman was presented with blank account opening papers, which he did not read, and which he signed at the direction of Sandelier. The account opening papers were then filled in with false information, including grossly inflated statements of Norman's net worth and annual income. Norman had no contact with the Union broker assigned to his account, Trevor Koenig, who had ties to Sandelier. Koenig, however, signed and approved Norman's account opening forms.

On August 28, 1998, shortly after the opening of Norman's Union account, Capwill transferred $749,990 (representing $750,000 minus wire transfer fees) into that account from his CFL account at Star Bank in Ohio. Norman then signed a wire transfer on September 1, 1998, directing Union to remit the same funds to an account in his name at First Montauk, another brokerage firm. Despite suspecting potential money laundering, Union's CEO, John Thompson, authorized the large transfer of funds on the condition that the money be transferred to another

2

account in Norman's name. Thompson did so based on Koenig's incorrect assurance that the transfer was part of a valid trading transaction.

The second transaction involves another Union brokerage account opened by Capwill on February 9, 2001, with Koenig as the broker. By this time, the *Liberte v. Capwill* litigation had commenced, with CFL and VES being placed in receivership in July 1999. On August 15, 2000, the Court found that Capwill could not account for $54 million in investor funds and was using subterfuges to hide assets. By this time too, Union was aware that Koenig was the target of an investigation by the British Columbia Securities Commission (BCSC). Koenig had been under monthly supervision by Union since June 2000 due to his involvement in possible manipulative stock trading; this conduct ultimately led to his conviction for securities fraud in the United States in 2002.

Shortly after opening his Union account, Capwill deposited 200,000 shares of stock he owned in a company called 2DoBiz.com into the account, shares that he had acquired as part of a consulting agreement with 2DoBiz.com. On April 23, 2001, Capwill instructed Union to transfer the 200,000 shares to a Union account in the name of International Investor Relations Group (IIRG), which was owned by Sandelier. Union complied on May 15, 2001.

In this suit, Plaintiff brings claims against Union for civil conspiracy, aiding and abetting common-law fraud, and negligence.

## II. Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(c). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250(1986) (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586(1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; see also *Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*,

4

20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; see also *Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

**III. Discussion**

*I. Civil Conspiracy*

The elements of a civil conspiracy claim under Ohio law are: "(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Universal Coach, Inc. v. New York City Transit Auth., Inc.*, 90 Ohio App.3d 284, 292 (1993). The requirement of malicious combination to injure "does not require a showing of an express agreement between defendants, but only a common understanding or design, even if tacit, to commit an unlawful act." *Gosden v. Louis*, 116 Ohio App.3d 195, 219 (1996). In proving this element, " 'it is sufficient that the parties in any manner come to a mutual understanding that they will accomplish the unlawful design.' " *Id.* (quoting *Pumphrey v. Quillen*, 102 Ohio App. 173, 178 (1955)).

Civil conspiracy does not require the existence of a duty on the part of the alleged co-conspirator. See *Williams v. Aetna Finance Co.*, 83 Ohio St.3d 464 (1998). Rather, there must simply be evidence of a common understanding or design to commit an unlawful act. Moreover, "[t]he malice involved in the tort is 'that state of mind under which a person does a wrongful act

5

purposely, without a reasonable or lawful excuse, to the injury of another.'" *Id*. at 475 (quoting *Pickle v. Swinehart*, 170 Ohio St. 441, 443(1960)).

In this case, the Receiver alleges that Union conspired with Capwill and others to defraud several entities, including viatical investors, CFL, and VES, by wrongfully diverting funds. An entity like Union can be held liable for the intentional torts of its employee loan officers committed within the scope of their employment. *Williams*, 464 Ohio St.3d 464 at 476. Because there is ample evidence in the record supporting an inference that Koenig was Union's agent and was acting within the scope of his agency at all times material hereto, Union can be held liable for his conspiratorial acts.

Union argues that there is insufficient evidence in the record of its knowledge of the conspiracy to withstand summary judgment. The Court disagrees. It has long been settled that a party's knowledge of a conspiracy's wrongful purpose can be proven through circumstantial evidence alone. See *United States v. Sliwo*, 620 F.3d 630, 638-642 (6th Cir. 2010) (Katz, J., dissenting). In this case, there is ample circumstantial evidence in the record supporting an inference that Koenig conspired with Capwill, Sandelier, and Paul Giarmoleo, Sandelier's friend and a broker at First Montauk, see *Javitch v. First Montauk*, 279 F.Supp.2d 931, 935-937 (N.D. Ohio 2003), to approve the wrongful transfer of funds from CFL to Norman's nominee account at Union, and then to Norman's nominee account at First Montauk. Koenig approved Norman's account opening papers, which contained wildly false financial information, despite never having met or spoken with Norman. Additionally, Koenig gave assurances to Union's CEO, Thompson, that the transfer of $750,000 out of Norman's account was part of a valid stock trading transaction, which turned out to be false. When coupled with Koenig's established relationship with

6

Sandelier, these facts, viewed in the context of the whole record, give rise to a fair inference that Koenig conspired with Capwill, Sandelier, and Giarmoleo to effect fraudulent money transfers. While it is possible that Koenig's actions were merely the result of extreme sloppiness and credulity, there is certainly more than a scintilla of evidence supporting the conclusion that this sophisticated broker knew that he was participating in a money-laundering operation.

There is also sufficient evidence of Union's knowledge with regard to the 2001 2DoBiz.com stock transaction to survive summary judgment. Koenig's actual knowledge of that transfer's unlawful purpose can be inferred from evidence of his prior course of dealing with respect to Capwill, Sandelier, and Giarmoleo. It may also be inferred from Union's willful blindness of the pending actions against Capwill for viatical fraud, in the face both of internal procedures and regulatory norms requiring brokers to investigate the reputation of new clients as well as Union's own decision to closely supervise the activities of Koenig. See *United States v. Hoffman*, 918 F.2d 44, 46 (6th Cir. 1990) (upholding jury instruction that "a defendant's knowledge of a fact may be inferred from willful blindness to the existence of the fact.").

Union contends additionally that the Receiver's conspiracy claim must fail because proximate cause is lacking. Union argues that if it had not accepted the transfer of money to Norman's account from CFL, Capwill would have simply transferred the money directly to Norman's First Montauk account. Thus, according to Union, passing the money through Norman's account at Union did not advance any improper purpose of Capwill's. Alternatively, Union argues that "the fraud perpetrated on the viatical investors was essentially complete" when Capwill improperly removed the $750,000 from his account to that of CFL.

Under Ohio law, "the acts of coconspirators are attributable to each other." *Williams*, 83 Ohio St.3d at 476. Indeed, "[a]ll those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt the wrongdoer's act done for their benefit, are equally liable." *Id*. (quoting Prosser & Keeton on Torts (5 Ed.1984) 323, Section 46).

Here, there is ample evidence to support a jury finding that Union's act of facilitating the $750,000 "in-and-out" transaction from Capwill's CFL account to Norman's Union account furthered the conspiracy's wrongful purpose. So long as the $750,000 remained in CFL's account, it remained available to satisfy investor claims. Capwill's embezzlement thus was not complete until the money was placed in Norman's account, out of the reach of investors. Moreover, the use of Union's facilities played a key role in the illegal purpose of the conspiracy by allowing Capwill to transfer funds to Norman's First Montauk account without any readily apparent tie between the money and Capwill, Ohio, or the viatical business– ties that would have existed had the money been transferred directly from CFL's account with Ohio-based Star Bank. Routing the funds through a Canadian entity, Union, that was beyond the reach of United States subpoena power thus advanced the conspiracy's wrongful purpose. It is immaterial that, in theory, there were other ways Capwill and his associates might have accomplished their purpose in the absence of Union.

Union also argues that there is insufficient evidence to support a finding that it participated in a conspiracy relating to the second transaction, involving the transfer of 200,000 shares of stock from Capwill's Union account to one in the name of IIRG that was controlled by Sandelier. Union argues that the chain of causation was broken as to this transfer because Capwill mentioned

8

all the essential facts concerning it in a deposition attended by the Receiver on May 1-2, 2001, and yet the Reciver did not immediately act to halt it. This argument is flawed for several reasons. For one thing, Capwill falsely indicated during his testimony that the transfer was complete, when it was not. For another, even if the Receiver had suspected that Capwill was lying about the transaction, the two-week window from Capwill's testimony to May 15, when the transfer was completed, was not enough time to gather evidence or engage in discovery via a time-consuming letter rogatory proceeding involving the Canada-based Union, which is beyond the reach of United States subpoena power.

Finally, Union contends that the Receiver has failed to show damages attributable to the alleged conspiracy. Under Ohio law, the requirement that a civil conspiracy result in actual damages does not mean that "damages ha[ve] to be attributable only to the conspiracy to the exclusion of the underlying tort." *Gosden v. Louis*, 116 Ohio App.3d 195, 221 (1996). Instead, it requires merely that recoverable damages "cannot be the result of just any tort committed by a conspirator, or just any act committed in furtherance of the conspiracy," but rather must result from a tort "committed in furtherance of the conspiracy." *Id*. Under this standard, the Court finds that there is sufficient evidence showing that the allegedly fraudulent acts here at issue were committed in furtherance of the conspiracy, and that these acts resulted in damage to the viatical investors, to survive summary judgment.

## *II. Aiding and Abetting*

Union also urges dismissal of the Receiver's aiding and abetting count. It submits that a civil cause of action does not exist under Ohio law for aiding and abetting common-law fraud. Consistent with this Court's previous discussion of the matter in *Javitch v. First Montauk*, 279

F.Supp.2d 931, 946 (N.D. Ohio 2003), the Court finds, under the reasoning of *Aetna Casualty and Surety Co. v. Leahey Construction Co., Inc.*, 219 F.3d 519, 532-534 (6th Cir. 2000), that the Ohio Supreme Court would recognize a claim for aiding and abetting common law fraud.

The standard for civil aiding and abetting claims is: "(1) knowledge that the primary party's conduct is a breach of duty and (2) substantial assistance or encouragement to the primary party in carrying out the tortious act." *Aetna Casualty*, 219 F.3d at 533 (internal quotation marks omitted). Although Union contends that the evidence is insufficient as to both elements, the Court finds otherwise.

As to the "actual knowledge" requirement, the Sixth Circuit has stressed that "evidence establishing negligence, i.e., that a bank 'should have known,' will not suffice." *Id.* at 536. "Knowledge may be shown by circumstantial evidence, or by reckless conduct, but the proof must demonstrate actual awareness of the party's role in the fraudulent scheme." *Id.* at 537 (quoting *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 96 (5th Cir. 1975)). Moreover, to satisfy the knowledge requirement, evidence that an aider and abettor had "a general awareness of its role in the other's tortious conduct" will suffice. *Id.* at 534.

For substantially the same reasons noted above in connection with the knowledge element of the Receiver's civil conspiracy claim, the Court finds that there is sufficient evidence that Union had "actual knowledge" of the fraudulent nature of the money transfers here at issue to survive summary judgment.

For largely the reasons noted above in discussing the proximate cause aspects of the Receiver's civil conspiracy claim, the Court finds that there is sufficient evidence to support a jury finding that Union provided "substantial assistance or encouragement" to Capwill, Sandelier, and

10

Giarmoleo, and that such "substantial assistance" was the proximate cause of injury to viatical investors.

### *III. Negligence*

The statute of limitations applicable to the Receiver's negligence claim against Union regarding the $750,000 "in-and-out" Norman transaction is the four-year statute of limitations contained in Ohio Rev. Code Ann. § 2503.09(D). *Investors REIT One v. Jacobs*, 46 Ohio St.3d 176 (1989). That means the Receiver's negligence claim regarding this transaction accrued on September 1, 1998, the date that the transfer of the $750,000 to Norman's First Montauk account occurred. The Receiver filed his negligence claim against Union on September 24, 2002, more than four years after September 1, 1998.

The Receiver contends, however, that he is entitled to equitable tolling of the statute of limitations, or, alternatively, that his claim is timely based on the "delayed damages" theory of *Fritz v. Bruner Cox, LLP*, 142 Ohio App.3d 664 (2001). The Court cannot accept either theory. Under Ohio law, in order to invoke equitable tolling of the statute of limitations, a party must show its reasonable reliance on a misrepresentation that "was calculated to induce a plaintiff to forgo the right to sue." *Hoeppner v. Jess Howard Elec. Co.*, 150 Ohio App.3d 216, 225 (2002). No such misrepresentation has been shown in this case.

As to the Receiver's "delayed damages" theory, the Ohio courts have emphasized that the "delayed damages" rule is not a discovery rule, "as it deals with the delayed occurrence of damages, not the discovery of injury." *Fritz*, 142 Ohio App.3d at 670 (internal quotation marks omitted). In this case, the Court finds that the harm resulting from Union's alleged negligence in facilitating the transfer of the $750,000 commenced when Capwill began using the transferred

11

funds in Norman's First Montauk account to buy securities, which occurred almost immediately after the funds had been transferred. Thus, there were no "delayed damages" in this case.

With respect to the 2DoBiz.com stock transaction, the Receiver contends that Union owed a duty to viatical investors based on the foreseeability of harm to investors. In *Javitch v. First Montauk*, 279 F.Supp.2d 931, 939 (N.D. Ohio 2003), this Court found that Giarmoleo, a securities broker, owed a duty to investors based on his knowledge that the funds placed with the brokerage were escrowed. Based on Giarmoleo's awareness of this fact, the Court found that he owed a duty to the non-customers whose escrowed funds were at issue. In this case, by contrast, there is no comparable evidence that Koenig had specific knowledge of investor interests in the 200,000 shares of 2DoBiz.com stock. Thus, the Court declines to impose a broad duty on Union towards non-customers with whom they had no direct relationship. The Receiver's negligence claim against Union will be dismissed in its entirety.

**IV. Conclusion**

For the foregoing reasons, Union's motion for summary judgment (Doc. 279) is granted in part and denied in part. Summary judgment is granted in Union's favor as to the Receiver's negligence claims, and is denied as to the civil conspiracy and aiding and abetting claims.

IT IS SO ORDERED.

                                                s/ *David A. Katz*
                                                DAVID A. KATZ
                                                U. S. DISTRICT JUDGE